Case before the Court is Mortgage Grader v. First Loan Choice, Case No. 151415, Appeal from the United States District Court for the Central District of California. Mr. Coffman, is there three minutes for rebuttal? That's correct. Okay. Mr. Coffman, is there three minutes for rebuttal? Good morning, Your Honors. May it please the Court. My name is Craig Coffman, and I'm here on behalf of the Appellant Mortgage Grader. Your Honor, we're here to look at the decision of the District Court in Orange County surrounding waiver in Section 101. Can I ask you to get one thing just concrete? Were all of the claims in the two patents held invalid in the judgment? No, Your Honor, just the four asserted claims. So it's claims 1, 2, and 19 of the 694 patent. The final judgment says, final judgment based on the earlier decision, the earlier decision says the patents are invalid. Do we need to reform that in order to limit it to a specific list of asserted claims? I believe his order specifically states that it's claims 1, 2, and 19 of the 694 patent. I believe it doesn't. 830. I could be wrong. I recall looking at this at one point in the dark and distant past and concluding that he had limited it to a specific list of asserted claims. But in the event that he did not limit it to specific claims, it should be limited to the specific claims because that was the only issue presented to the Court. It was the only issue decided by the Court. There was no discussion of all the claims generally. There are a number of independent and defendant claims that have different limitations that may or may not. Sorry for the detour. No, I'm happy to answer any questions. So the timeline. This case was filed in 2013. By 2013, we had Bilstein. We had CyberSource. The CLS analysis was churning through this Court, well known to the Bar. In August of 2013, Judge Guilford instituted his standing patent rules to govern the process of patent cases beforehand and made them applicable to this case. How did he make them applicable to this case? Because on their face they said they apply only to cases filed on or after September 1st and this was filed January 10th. He filed, he issued an order, I believe it was on August 30th or 31st of 2013, advising us that he had entered the rules and advising us that the rules were applicable to this case, notwithstanding the statement on the face of the rules that say they don't apply to cases before that. So it's in the docket that he issued an order on August, it was either the day that he promulgated the rules and made them available or it was the day after. But he, we hadn't had a schedule in conference. We hadn't, nothing had happened other than the appellees had filed a motion dismissing it or transfer that was pending before the Court in response to the complaint and that was, that was in play but there had been no answer. Okay, so there was no objection to his application of these rules to your case. And his rules, I mean they are his obviously, they are, they are somewhat different than the rules for instance in the Northern District of California, are they not? That's correct, Your Honor. The current version of the Northern District rules require you to make an initial disclosure and then if you are going to change your disclosures in any way, you have to seek leave of court before you can submit those disclosures. In contrast, Judge Guilford's standing order does contemplate a final set of infringement contentions, a final set of invalidity contentions, but requires an explanation of good cause for any changes made to those. Okay, and you are not saying that he in some way didn't have the authority to issue rules that differed from those in the Northern District of California? Absolutely not. Judge Guilford is free to adopt the patent rules as he sees fit so long as they comport with this court's decision in O2 and we are not arguing that they don't. Okay, now, so one of the questions you have with respect to good cause is whether impliedly that should have required a prejudice analysis, right? I think if they don't, and the Northern District President, and we don't have any precedent applying his rules other than this one, the Northern District President has consistently held that if the party asserting the new defense or the new issue, whether it's a new infringement allegation or whether it's a new invalidity allegation, has a burden of showing that they were diligent in coming up with and coming forward with that particular defense or that particular infringement allegation. And if there is no diligence, then there's no need to get to the question of prejudice. If the answer to the question, were they diligent, is no, that ends the inquiry and there is no need to consider prejudice. Now, he didn't really consider prejudice in this case, whether he has to under his rules or not, but they clearly were not diligent in bringing the defense and so we don't need to get to prejudice if they weren't diligent. Okay, and though you do spend time in your brief on the issue of prejudice and its failure to get there, I see two problems with that. One is that we have repeatedly said that district courts have broad authority to interpret their own rules and this would be especially so where we're talking about a single judge adopting a set of rules of his own. And the other problem is I don't see that you argued prejudice in the first opportunity you had for hearing on this issue. I believe we made a prejudice argument, a short one, but the focus really was and always has been diligence. And the focus of our briefing, at least, has been primarily on the diligence of first choice in bringing the 101 defense to the court and not so much the prejudice. Okay, on the issue of diligence, I mean, you correctly cite us to your supplemental authority for the proposition that we said a district court was acted within his or her discretion to deny a motion to amend solely on the basis of the Supreme Court's decision in Alice. But here we're talking about a standard of review that is abuse of discretion. So even if it's true that it might have been within a district court's discretion to deny a motion to amend, wouldn't it also be within the district court's discretion to grant a motion to amend? I think that if there's a clear lack of showing of diligence and the appellees here have the highest precedent in O2 micro, that it is an abuse of discretion if they don't meet their burden to show that they were diligent in bringing the defense. I acknowledge that it is a high burden of proof here. I recognize that. But this is, I think, one of the rare cases where it's inexplicable. Everybody would have thought that they would have braved the Section 101 defense in 2014 and 2013 in their initial invalidity contentions. And yet in their initial invalidity contentions submitted to the court two months after they pled 101 in their answer, they say affirmatively we are not asserting Section 101 as a defense. Can you fill in the timing of close of discovery, summary judgment period, these, I guess, final invalidity contentions, trial date? Can you explain where in that sequence this, in particular the final invalidity contentions falls? So the initial invalidity contentions came two months after the answer in December 2013. The final invalidity contentions came in late August of 2014 pursuant to the scheduling court. Summary judgment was... Well, you had a month and a half left on discovery. We had about a month and a half left on discovery and then that we had our summary judgment deadline. We filed a motion to strike and a motion for partial summary judgment on one of the defenses. At the same time, Appellees filed five motions for summary judgment. The judge vacated those particular motions because he felt that five motions was too much and that they should have brought one motion. And so that started a schedule creep which led to the hearing in October on our motion to strike and our motion for summary judgment once he had rendered a decision that they could retain their Section 101 defense. He then gave them a calendar to present a 35-page brief to the court. We had to bring in a calendar to respond. The hearing was held in January and we were set for a February trial date. Originally, we were set for a January trial date for the Tuesday after Martin Luther King Day. Let me describe a scenario of possible reasonableness of what they did and tell me what's wrong with it. There's always an interest in choosing the better over the less good issues for the court and the parties to spend their scarce resources, time, money, perhaps limits on their resources. There was substantially less sharpening, less precision, less strictness of the 101 standard. And under this scenario, the other side could have thought, well, we actually have better issues than that given the amount of time and resources those would take up. When Alice comes down, they say, this is actually incredibly good. It's now moved up in the priority list and that's a good enough reason to allow them to do what the court wants them to do, which is to prioritize how the case is going to be, what's going to be the center of attention in the case. A couple of responses to that, Your Honor. First, traditionally in Northern California, the district court there and this court approving of their activity has viewed changes to contentions, invalidity or infringement contentions as being held to a stricter standard to avoid what is referred to as the shifting sands approach to litigation. And so in that context, courts have held and courts have applied a stricter high than the usual fairly flexible discovery responses. As far as the uncertainty, their theory of invalidity under Section 101 is based in effect that it could be done with pencil and paper and that was a theory of the dealer track cases that were decided by this court long before Alice came along. Isn't it fair to say that given the splintered nature of our decision in Alice and the fact that there was clearly going to be some time frame in which it was going to take the Supreme Court to assess these questions, that maybe the defendants thought the case was going to move more quickly and they could focus on otherwise dispositive issues and not get tired in the 101 world? Here's the other problem with that and that's the overall context here. When they submitted their final invalidity contentions and their expert reports on invalidity, they added two new pieces of prior art that were not in the initial invalidity contentions. And Judge Guilford said you can't do that. And Judge Guilford said you can't do that. They had focused, but they had focused only on those two pieces of prior art. All of the art that was cited in the original invalidity contentions did not make it into the expert report. None of it did. It was all focused on their patent application and the piece of prior art cited in their patent application that they disclosed for the first time in their expert reports and their final invalidity contentions. What does that have to do with the 101 issue? It has nothing independently to do with the 101 issue, but it goes to Judge Taranto's prioritization and the nature of prioritization here. If they had prioritized, if there was a reasonable explanation around prioritization and they had prioritized and we had seen a really good anticipation defense that was presented in the initial infringement contentions, or these invalidity contentions, and carried through to the final invalidity contentions, then there's some sense that maybe they made a rational choice. But given the whole context here, there's no indication of that sort of focusing that choice either to preserve their own patent applications or for unexplained reasons not to assert a Section 101 defense. In addition to prioritization, do you think Section 285 might have implications here? Perhaps they were early on worried that a 101 might be weak enough that ultimately if they wasted the court's time with it, they might get hit with an exceptional case finding later on, but post-Alice and in the time frame when they added it back, they didn't need to be as concerned with that. There was never any articulation of 285 as a basis for not entering that particular decision. Isn't it the case, though, that there are some Alice or 101 motions that prior to the Supreme Court's decision in Alice were weak or even denied that we know subsequent to That certainly is factually true. So given that, how could it be an abuse of discretion to allow a party in this time frame to change their mind before and after the Supreme Court's decision in Alice? Because their theory, Your Honor, because their theory was predicated on concepts that existed prior to Alice and such as those set forth in CyberSource. Well, I think in Ultra-Marshall, didn't this court deny a 101 to Alice? Twice. Twice? And then ultimately granted it post-Alice. Did the theory change? The theory underlying the motion, did it change? In terms of Ultra-Marshall, it couldn't have changed because it was just coming back from the grant vacate and remand from the Supreme Court. So isn't that very similar to here? I would argue no, only in the sense that they could have raised the issue before and they didn't. And that's the idea. Okay. Well, I'll give you a rebuttal back. Thank you. May it please the Court. My name is Rebecca Steffink-Coyle. I'm here on behalf of the appellees. First Choice Lend Services and NILAC Inc. who I will refer to collectively as NILAC rolls a little easier off the tongue. Why shouldn't we do this as a sandbag? I mean, what was it, six days after the Supreme Court granted cert now, you withdrew your 101 assertion. It seems like you were walking away from that, abandoning it, and then all of a sudden at the close of discovery, you renew it. At the time of our initial invalidity contentions, as Justice Stark noted, Ultramercial 2 had been issued. And in Ultramercial 2, claims that are analogous to mortgage graders' claims which have since been invalidated were found to be patent eligible under 101. Post-Atlas, with the specific focus on how a computer does or does not affect an abstract idea, changed that law, changed Ultramercial, and in subsequent changed our view of the cases as Mr. Grandinetti, who had argued the motion to strike in front of Judge Gilbert, noted, and this is in the appendix A1010, Mr. Grandinetti noted that we were kind of in a bind with our initial invalidity contentions. If we were too aggressive from the get-go, we'd be accused of overreaching and implicitly 285 implications. And of course we were worried that Atlas would have been granted cert, but we're also aware of this Court's ruling in Ultramercial compared to its ruling in Atlas. And we felt that the claims in mortgage graders' patents would have survived a pre-Atlas application of 101. But then once Atlas was decided and the focus on the computer implementation and what that means or what it does not mean for an abstract idea, refocused our view and led to the conclusion that we actually had a good faith reason to bring the 101. We weren't going to bring the 101 earlier when we didn't think it would prevail. That's a waste of our time, a waste of the Court's time, a waste of Mr. Kaufman's time. Can I ask you that, just to clear up the housekeeping matter I raised right at the beginning, what do we do about the language of Judge Guilford's decision at A30 which says the patents are invalid? I believe in the motion to strike order, Your Honor, A30. Well, whatever the order is. In the motion to strike order, Judge Guilford in the section immediately following the, his motion to strike had the two parts, it had the 101 motion to strike and then it had the... The 28-page order. Yeah. It's the one where he actually rules on the 101 question, whatever it's called. On page A30, in his order, he does state that, I believe in his order he does state that it's applied to the asserted claims. This seems important, so I'm sorry to waste your time on this. So the final judgment of A1 and A2, A2 says in light of the January 12th, 2015, order granting in part defendant's omnibus motion for summary judgment, which is a motion that starts at A3, orders judgment entered against Mortgage Grader and in favor of First Choice Law. It doesn't say what the scope is, but it's in light of the motion that runs, the order that runs from A30, A3 to A30. The omnibus motion. Page A30, disposition. For the foregoing reasons, the motion is granted in part. The 728 and 694 patents are invalid under 35 U.S.C. 101. On A14, Your Honor, in that same order, he says at the end of the 101 analysis, the court grants summary judgment that the 728 patent claims 6 and 694 patent claims 1, 2, and 19 are invalid for failure to satisfy 101. I think that his statement at the very end of his summary judgment order was just a, he forgot to add in the specificity that he had earlier in his order when he was actually analyzing the issue. But you agree that the scope, in fact, should be limited to the identified claims? Yes, Your Honor. We only addressed the asserted claims during our 101 analysis. Would it have been an abuse of discretion if Judge Guilford had granted the motion to strike the 101 defense? Yes, I believe it would have, Your Honor. How could that be? Because the implication of Alice was sufficient to change the face of the law directly applicable to these claims. Of course, there are other claims that could have been asserted from other patents where Alice wouldn't have had a direct implication, but that was not these claims. These claims are specifically tied to a computer and how doing steps, some abstract steps on a computer, is or is not overall patently ineligible under 101. So are you saying that we erred in finding in similar circumstances that it was not an abuse of discretion to deny, leave to amend? Are you referring to the SmartFlash case? Yes. No, I don't think that was an error because in the SmartFlash, the, I believe it was Apple, was the one who was arguing that Alice had an impact on their timing of bringing the CVM, which they wanted the court to then save the litigation for. But in that case, they had moved for, say, right at or right after trial had already ended, and the timing in that case is a significant difference from the timing in this case. But didn't we say repeatedly in that case that Alice was not enough of a sea change? My reading of the SmartFlash case is that is applied to you can't delay something, delay bringing a CVM, delay asserting a defense, and then say that the delay doesn't matter. And that is not an argument we were making in this case. I know it was mostly talked about the discretionary question, but there is also the finding on 101 that I think is part of the appeal here as well. Indeed. Answer the criticism that Judge Gilkirk did not draw all reasonable inferences in favor of the patentee on the summary judgment, and in fact, to the contrary, resolved factual disputes in your favor, which shouldn't have been done. I respectfully disagree with Mr. Kaufman's analysis of the judge's order. I don't think the judge ever drew any sort of factual determination. The judge looked at the claims. If you read his order, he says the language of the claims say this. The language of the claims afford for this, but not that. He does not ever give any weight to anyone's expert reports. They are mentioned as a cite to his cite to our brief to say, well, the defendant said this, and the plaintiff said this, and this is where they said it. And that's all he said. There was nothing more to it. And moreover, you don't even need to look at the expert reports to figure out these are abstract ideas. So then why did you submit expert reports? There's a few reasons, Your Honor. One was, at this point, we wanted to make sure that there were some factual statements on the record for summary judgment since depositions, particularly for Mr. Poniak, had not yet occurred. They have been pushed back. And also, they are historical in nature, and had the court felt the need to cite to them and rely on them, he could have, but they are by no means necessary. It's been added support for finding that the methods and the system with the method proposed in the mortgage grader patents were abstract ideas, things that could be done by humans. And not only could they be done clearly on the face of the patents, but they even have. Moreover, Mr. Lieber... I'm sorry. They even have? They even have. If you look at the mortgage rate tables, which were the subject of the expert reports, mortgage rate tables allowed one in the newspaper to take a look at the available loans. You base it off of what criteria you have. This actually picks up on Judge Stark's point. The Supreme Court, while not defining what an abstract idea, has focused on some, at this point, subset of activities leading to the creation of contractual obligations. Filski is that. Howis is that. And the subset is the ones that are really old and familiar. The have in your expression. It's been done historically. Hence the utility of your expert submission of these Washington Post ads with possible mortgage rates and so on. Why is that not a factual question? And it may be a sufficient answer to say they had nothing to dispute, that there were things like that. And so I guess that's probably the first question. Did they have evidence to dispute what that page in the Washington Post appears to show? The Mr. Leibowitz mortgage raters expert did not dispute that these rate charts existed or that people used them to find mortgages. The two things he disputed was, one, that the rate charts did not set forth nearly the amount of available loans. That doesn't matter. That's not in the claims. It's not claimed anywhere in the claims. And his second dispute is that some personal information was not taken into account in the rate tables. But that can't be true either because the rate tables included the LTV, the loan amount, and either your credit score or a range. And those are the exact same data points that a mortgage grader used to assert that the accused website used personal information for the claim. So they can't argue one thing for infringement and then try to push it to the side for invalidity. They have to stick with it. Well, couldn't there be a distinction here between a circumstance in which something is claimed, an activity is claimed, and all you're doing is saying, and then put it on a computer or use a computer to do this, and a circumstance in which the argument is that the computer is absolutely necessary to the process in order to maintain anonymity that the process offers? The computer is not necessary to maintain anonymity, though. And it's something that Judge Gilford even noted in his order. You could have someone fill out a form in a room by themselves, fill in the form, leave it on the table, walk away. Someone else walks in, takes the form, doesn't know who filled it out, goes, compares it to information they've received from a lender, figure out what matches, what doesn't, puts it back in the room, walks out, somebody comes in. You could do it over the phone without mentioning your name, your ethnicity, your gender, your religion, whatever it was that Mr. Lazuson was trying to avoid discrimination for. You didn't need to do it on a computer. Is it faster on a computer? Sure, of course it's faster on a computer, but that doesn't mean it's not an abstract idea. Well, it's different. I don't think they argued it was faster on a computer. They argued that it was more protective of the anonymity because it avoids the human biases that would naturally come into play. It's not the computer that avoids human biases. It's anonymity that would avoid human biases, and you could have anonymity without using a computer. You don't have to meet the person. You don't have to learn their name. You could talk to them over the phone. You could leave a form checked. You don't need a computer to maintain anonymity. All right, thank you. Thank you, Your Honor. Briefly to respond, the last point on waiver, Your Honor has talked about SmartFlash. SmartFlash was similar in the sense that Apple had filed a first set of CBMs that did not raise 101. These CBMs were granted in part but denied in part. Not all the relevant claims were involved. They then, after Alice, waited and then asserted the CBM at a later date. That is similar in the sense of the delay to the conduct of first choice and NILACs here. Well, in Apple, there was no issue that the, in SmartFlash, that the Apple claims would have any similarity to the Ultramershal claims. What's your response to your friend's argument that really it was Ultramershal that gave them pause? Well, Ultramershal was decided after they, the renewed Ultramershal was decided after they submitted their final invalidity contention. So I'm not sure how this court's rejection of the Ultramershal claims could have impacted it. No, your argument is the other way around. Okay. The failure to reject those claims. At round one. At round one. There are plenty of examples, however, of claims that had been rejected in the business method arena, like DealerTrack, like CyberSource, like Fork Properties, that had been rejected under 101 and that predated CyberSource. So to say that it wasn't available or that it couldn't have been in good faith asserted, I think, is somewhat disingenuous given that, given the disarray. Addressing Judge Stark's point on the summary judgment question, this court has clearly said it's a question of law as to whether something complies with 101. At least in the censure and arrhythmia, they have said factual findings could underlie it. We suggest that comparison of a claim to an activity is historically a factual inquiry under this court's jurisprudence in the infringement context. And that's effectively what was done here. Evidence was presented and relied on by them. Evidence was presented and relied on by us. The judge doesn't cite it, but he either resolved it without saying it or he simply came up with his own answer. Well, what factual dispute that you had is really material to this determination? I think their facts are provided to support the idea that a person could do this in their head. Our facts were supported that the point of this was, you know, it's computer implemented to prevent the steering problem, which is slightly different from discrimination based on race, although that's certainly an issue that can come up with anonymity. But the steering problem is the mortgage broker gets paid, you know, $1,000. If I give you just one particular loan and $500, if I give you a loan, it is better for you, but not better for me. And that's the other aspect of the problem in trying to be addressed here. And Mr. Lebowitz's declaration talks about that, and that was in dispute, and resolutions have been made. Do the claims refer to steering? The claims do not use the word steering, no. Okay, so you want us to read the specification and read into the claims that limitation? I think the term reading in is a loaded term, Your Honor. Okay, construe the claim to contain that limitation? I think looking at the claim as a whole, it is designed to avoid that kind of content. You write in your brief, and I think you get it from Mr. Lebowitz's declaration, that humans by their very nature cannot perform these processes in a manner to best serve the consumer. It seems like an overly broad view, not to say a very negative view of humankind. But is that something that a reasonable fact finder could actually find on this record, that humans just are not capable of doing this? I think, well, on summary judgment, I'm not sure that they could find particular facts. But on summary judgment even, there has to be a sufficient record that we could say a reasonable fact finder could find for you. I think that based on Mr. Lebowitz's declaration, a fact finder could find that particular fact. You make a point in your brief about also saying that you thought additional discovery might have altered this 101 analysis. What would you have looked for? It's hard to say at this point. I didn't have anything specific in mind, or I would have said it in my brief. Did you move to extend the discovery deadline? The only extension of the discovery deadline was we reached agreement with them, because some of their fact witnesses were also expert witnesses, that to consolidate and to not burden their schedules, we would just depose them once, because it didn't seem to make sense to depose Mr. Kainak as a fact witness, and then a month later depose him again as an expert. But we didn't articulate any specific discovery. Okay. All right, thank you. Thank you. Cases will be submitted. Court is adjourned. The Court is adjourned. The Court is adjourned. The Court is adjourned. The Court is adjourned. The Court is adjourned. The Court is adjourned. The Court is adjourned. The Court is adjourned.